A08A0793. KILROY et al. v. ALPHARETTA FITNESS, INC. et al.
(671 SE2d 312)

PHIPPS, Judge.

This action arose in connection with the purchase of assets of an exercise facility. After the transaction closed and the corporate

purchaser began operating the facility, revenue failed to meet the projections previously calculated by the purchaser's shareholder. The corporate purchaser, its shareholder, and his wife sued the corporate seller and its shareholders. The trial court granted partial summary judgment to the defendants on the claims of fraud and fraudulent transfer. For reasons that follow, we reverse as to both claims.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. In reviewing a grant or denial of summary judgment, this Court conducts a de novo review of the evidence.[1]

On November 22, 2004, an agreement to purchase for $1,000,000 the assets comprising and relating to a franchise, Gold's Gym, was executed by and between Alpharetta Fitness, Inc. (noted therein as "Seller") and its four shareholders, Christopher Palmer and three other individuals; and Yorlik Is Here, Inc. (noted therein as "Buyer") and its shareholder, Thomas Kilroy, and his wife. The transaction closed on February 28, 2005, and Alpharetta Fitness thereafter made disbursements for its debts and other obligations, including payments to its four shareholders.

The financial performance of the gym thereafter failed to meet projections calculated by Kilroy during the due diligence period. Yorlik Is Here, Kilroy, and his wife (hereinafter, collectively "Buyers") filed suit against Alpharetta Fitness and its shareholders, alleging breach of contract, negligent misrepresentation, fraud, and fraudulent transfer, in connection with the corporation's distribution of the proceeds from the asset sale to its shareholders. The trial court summarily granted the defendants' motion for partial summary judgment on the fraud and fraudulent transfer claims. The Buyers appeal; Alpharetta Fitness and its shareholders are the appellees (hereinafter, collectively "Sellers").

1. The Buyers challenge the grant of summary judgment on the fraud claim.

> The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff,

---

[1] *Ellison v. Hill*, 288 Ga. App. 415 (1) (654 SE2d 158) (2007) (punctuation and footnotes omitted).

and damage to plaintiff. For an action for fraud to survive a motion for summary judgment, there must be some evidence from which a jury could find each element of the tort.[2]

"One challenging an assertion of fraud on motion for summary judgment need show a complete lack of evidence as to only one of these elements."[3] The Sellers argued that there was insufficient evidence as to each of these elements.

The fraud claim stems from a practice the parties have referred to as factoring receivables. As the Sellers concede, Alpharetta Fitness engaged in the practice, whereby future monthly income streams from various individual membership contracts were either sold or pledged to a company, ABC Financial, Inc., as security in exchange for an immediate cash advance; and when the advance, associated service charge, and interest were paid back to ABC Financial, the future income streams from those contracts were released back to Alpharetta Fitness.

The Buyers maintain that the Sellers committed fraud in that they made misrepresentations related to this practice within the asset purchase agreement, pertaining to: (a) the status of the individual membership contracts, and (b) the accuracy of Alpharetta Fitness's financial statements. Regarding the individual membership contracts, the asset purchase agreement pertinently stated:

> As an inducement to Buyer entering into this Agreement, Seller and Shareholders, jointly and severally, hereby covenant, represent and warrant to Buyer as follows: . . . no assignment of rights in or relating to [the contracts] have been made by Seller or Shareholders.

Regarding the accuracy of the financial statements, the asset purchase agreement pertinently stated:

> All the financial statements for Seller and other financial information provided to Buyer by Seller and Shareholders are true and correct in all material respects and fairly present the financial condition of Seller, as the case may be, at the dates indicated. . . . [S]uch financial statements have been prepared in accordance with general accepted accounting principles consistently applied.

The Buyers maintain that, contrary to these representations, many

---

[2] *Crawford v. Williams*, 258 Ga. 806 (375 SE2d 223) (1989) (citation omitted).
[3] *Collins v. Regions Bank*, 282 Ga. App. 725, 727 (1) (639 SE2d 626) (2006) (footnote omitted).

individual membership contracts were encumbered through the practice of factoring receivables; and that, in connection with reflecting factored receivables, Alpharetta Fitness's financial statements were not true and correct in all material respects, did not fairly present the company's financial condition, and were not in accordance with generally accepted accounting principles.

Kilroy deposed that, in March 2005, he inadvertently discovered that some of the individual membership contracts had been "sold" to ABC Financial under the practice of factoring receivables and that his company, Yorlik Is Here, was receiving no revenue with respect to those contracts. It is undisputed that Alpharetta Fitness had contracted with ABC Financial to handle collection of its monthly membership dues. Kilroy testified that before his March 2005 discovery, he had understood ABC Financial's relationship with Alpharetta Fitness as the latter serving as *only* a "third-party billing company." He asserted that, during the negotiations period, there had been no mention that Alpharetta Fitness was engaged in factoring receivables.

During the due diligence period, which had begun in June 2004, Kilroy employed a certified public accountant. The CPA deposed that he was hired "[p]rimarily to look at the financial statements of the operation and try to determine the operating profit and cash flow of the business." To that end, in August 2004, he reviewed some of Alpharetta Fitness's financial statements. And in mid-November 2004, the CPA and Kilroy went to Alpharetta Fitness's offices to examine more financial records. There, they met with the company's bookkeeper and Palmer, the Alpharetta Fitness shareholder who also was the gym's onsite manager of day-to-day operations. The CPA deposed that their discussions had specifically included "the general cash flow of the business" and ABC Financial. He recounted that they had discussed the "mechanics of the cash flow, just the way they received their money from the ABC company"; they had discussed also that "ABC company would transfer the money to their bank account once or twice a month. And that periodically they would get advances against a subsequent draft. And that those advances were always withheld from the next draft." After that day, the CPA asked for and promptly received from Alpharetta Fitness its QuickBooks data files of financial records. He testified that he looked at the "cash deposits showing on the bank statements," the "revenues from April through September," but "didn't look at the ABC stuff."

After closing on the transaction and noting lower than expected revenue, Kilroy asked the CPA to again review Alpharetta Fitness's financial records. In so doing, the CPA spoke with ABC Financial personnel. The CPA deposed, "[B]ased on information we got from — I got from ABC, there were some deposits during the period that

we looked at [during the due diligence period] that were sales of customer accounts and not advances against the subsequent months' draft." According to the CPA, these sales had "caused the revenues for the period we looked at to be overstated. And it caused revenues subsequent to closing to be less than they would have been."

About September 2005, Kilroy retained as an expert another CPA, Gregory Hayes, to analyze for accuracy the financial records provided to him by Alpharetta Fitness. In particular, Hayes was asked to focus on the revenue of the business and how that had been represented. Accordingly, Hayes inspected Alpharetta Fitness's financial records, including the QuickBooks data files. After his initial examination, Hayes was unable to identify or account for some of the income. After obtaining additional "documentation," however, he determined that those amounts were bundles of "contract sales."

Hayes testified further that those contract sales had not been reported on Alpharetta Fitness's financial statements in accordance with generally accepted accounting practices. He explained that the sales of those contracts had been reflected as an "immediate recognition of revenue," or "revenue at the time of receipt when in fact they should have been recorded as deferred revenue and amortized into revenue on the financial statements." As a result, Hayes continued, "[I]n periods where these contract sales occur, it can make the revenue for a given month appear to be much higher than it really is because . . . you're accelerating many months of revenue into a given month." According to Hayes, income had been overstated for the year 2004, with at least five of the seven bundles of contract sales for that year having occurred between July 1 and October 31. He noted further that Alpharetta Fitness had employed this improper accounting method during the years 2002, 2003, and 2004.

Hayes further deposed that, prior to June 2004, the company's financial statements reflected as revenue the net amounts received from ABC Financial, without reflecting any expenses associated with transacting business. Beginning in June, however, the company's financial statements reflected the gross amounts received from ABC as revenue, in addition to reflecting the incurred expenses. Hayes testified that, while the latter accounting method was the "fairer way" to reflect the underlying transactions, comparing only the revenue stream for the first six months of 2004 against the revenue stream for the latter six months of that year could give a false impression of growing revenue.

Kilroy deposed that he had relied on the revenue reported on Alpharetta Fitness's financial statements for the months of January through September 2004 to project the business's future revenue and to ultimately formulate the purchase price for the assets. He

testified that his review of the company's financial statements showed that revenue was "increasing on a month-by-month scale." According to the Buyers, because the financial statements overstated revenue and were otherwise misleading, they were defrauded into paying too much for Alpharetta Fitness's assets.

> Given that fraud is inherently subtle, slight circumstances of fraud may be sufficient to establish a proper case. Proof of fraud is seldom ever susceptible of direct proof, thus recourse to circumstantial evidence usually is required. Moreover, it is peculiarly the province of the jury to pass on these circumstances showing fraud.[4]

Having reviewed the evidence in the light most favorable to the Buyers as non-movants below, we conclude that they presented sufficient evidence on each element of fraud to survive a motion for summary judgment. The asset purchase agreement plainly stated that "no assignment of rights in or relating to [the individual membership contracts] have been made by Seller or Shareholders." Contrary to this representation, Alpharetta Fitness had indeed sold or pledged all or some of the income streams of numerous of its individual membership contracts, and these contracts were encumbered as of the date of the asset purchase agreement. Palmer testified that he and the other three shareholders of Alpharetta Fitness had frequently discussed Alpharetta Fitness's practice of factoring receivables. Palmer claimed, however, that he had verbally instructed an ABC Financial employee that the membership contracts at issue should be released on the closing date and that any outstanding balance owed to ABC Financial in connection with those membership contracts should be charged to a company he (Palmer) was then forming to operate another Gold's Gym.

But the fact remains that the asset purchase agreement represented that, as of the date entered, no assignment of rights in the contracts had been made. And even after the closing date, numerous accounts remained encumbered until Kilroy discovered and complained about the matter. Palmer asserted that this problem was caused by an apparent misunderstanding concerning the instruction he gave to the ABC Financial employee.

Moreover, during the due diligence period, Kilroy and his CPA specifically discussed with Palmer and the company's bookkeeper Alpharetta Fitness's cash flow and the fact that Alpharetta Fitness would occasionally receive "advances" from ABC Financial. Yet,

---

[4] *Almond v. McCranie*, 283 Ga. App. 887, 889 (2) (643 SE2d 535) (2007) (citations omitted).

neither Palmer nor the bookkeeper clarified that some of those "advances" were actually "sales" of individual membership contracts. Palmer deposed that he did discuss with Kilroy that various accounts were being factored, but Kilroy deposed otherwise.

The record also supports a finding that it was not apparent from Alpharetta Fitness's financial records that the company was engaging in factoring receivables. Although the Sellers assert in their appellate brief that the Buyers were "specifically made aware of the periodic sales/advances of membership contracts by virtue of the fact that [they] were provided volumes of documents evidencing such transactions prior to closing," the Sellers have neither included in the record the particular documents referenced by their assertion nor otherwise provided any evidentiary support for their assertion as to such documents.

Thus, there was evidence of false representations. And where, as here, the evidence is not "plain and indisputable," the question of scienter is an issue of fact for jury determination.[5] Further, under the evidence, a jury would be authorized to find that the cited representations within the asset purchase agreement were made to induce the Buyers into purchasing Alpharetta Fitness's assets, that the Buyers justifiably relied upon those representations,[6] and that there were resultant damages to the Buyers. Regarding the damages, the evidence authorized a finding that, because of encumbrances upon numerous individual membership contracts, Yorlik Is Here was deprived of monthly revenue owed it under those contracts. Moreover, a jury would be authorized to find that Alpharetta Fitness's financial statements were materially misleading, that Kilroy reasonably relied upon them, and that he ultimately overestimated a purchase price. Because there was some evidence to support each element of fraud, the trial court erred in granting the Sellers' motion for summary judgment.

2. The Buyers challenge the grant of summary judgment on their fraudulent transfer claim, citing OCGA § 18-2-74 (a):

---

[5] Id. (except in plain and indisputable cases, scienter in actions based on fraud is an issue of fact for jury determination); see *Johnson v. GAPVT Motors*, 292 Ga. App. 79, 82 (1) (663 SE2d 779) (2008) (for purposes of summary judgment, scienter and intent to deceive are determined on the basis of the seller's knowledge of the falsity of his representations at the time made to the prospective purchaser); *GLW Intl. Corp. v. Yao*, 243 Ga. App. 38, 41 (3) (a) (532 SE2d 151) (2000) (with regard to scienter, the gist of an action for damages in tort based on the falsity of representations is that they must have involved actual moral guilt).

[6] See *Dyer v. Honea*, 252 Ga. App. 735, 740 (3) (b) (557 SE2d 20) (2001) (plaintiff must show that he exercised his duty of due diligence when means of knowledge are at hand and equally available to both parties to a contract of sale; if purchaser does not avail himself of these means, he will not be heard to say that he was deceived by the seller's representations; on the other hand, plaintiff is not required to prove that he exhausted all means at his command to ascertain the truth before relying upon the representations).

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

In light of evidence that, about seven days after the closing, the corporation distributed the proceeds of the asset sale to its four shareholders and that this distribution left the corporation with essentially no assets, together with our holding in Division 1, we reverse the grant of summary judgment to the Sellers on the Buyers' claim for fraudulent transfer.

*Judgment reversed. Barnes, C. J., and Johnson, P. J., concur.*

DECIDED DECEMBER 1, 2008 —
RECONSIDERATION DENIED DECEMBER 16, 2008 —

*Andersen, Tate & Carr, Ryan D. Worsley, Donald L. Swift III*, for appellants.
*David A. Anton*, for appellees.

